UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ADAM SHAPIRO, | |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL REQUESTED** |
| | **INJUNCTIVE RELIEF SOUGHT** |
| CIANBRO, INC. d/b/a CIANBRO CORPORATION, | |
| Defendant. | |

NOW COMES Plaintiff Adam Shapiro, by and through counsel, and complains against Cianbro, Inc. d/b/a Cianbro Corporation, as follows:

## SUMMARY OF THE ACTION

1.      This is an action for whistleblowers' reprisal in violation of 10 U.S.C. § 4701 and 41 U.S.C. § 4712.

2.      On May 12, 2021, Cianbro Corporation ("Cianbro," "Defendant," or "the Employer") terminated Adam Shapiro ("Plaintiff or "Mr. Shapiro") in reprisal for his multiple complaints about unsafe working conditions on barges that he moved back and forth from New Hampshire to the Portsmouth Naval Shipyard ("PNSY") pier in Kittery, Maine, carrying materials.

3.      Notably, Cianbro terminated Mr. Shapiro the day after he called an "all stop" because walkways on the barge were blocked by crushed stone which he previously had complained about to no avail. The only evaluation Mr. Shapiro received from Cianbro, two months prior to his termination, was positive. Mr. Shapiro's supervisor, Spencer Lawn, cautioned him not to complain about Ryan Collet's failure to address safety issues; when Mr. Shapiro nonetheless threatened to do so, Cianbro promptly terminated his employment.

1

4.      As a result of Cianbro's unlawful termination, Mr. Shapiro is seeking all available remedies, including back pay and benefits, compensatory and punitive damages, reinstatement or, if impracticable, front pay, injunctive relief, and attorneys' fees and expenses.

## JURISDICTION AND PARTIES

5.      This action arises under 10 U.S.C. § 4701 and 41 U.S.C. § 4712.

6.      Plaintiff Adam Shapiro is a United States citizen and a resident of Kittery Point, York County, Maine.

7.      Defendant Cianbro is a construction corporation domiciled in the State of Maine, doing business and headquartered in Pittsfield, Somerset County, Maine.

8.      Cianbro served as a government contractor to the United States within the meaning of 10 U.S.C. § 4701 and 41 U.S.C. § 4712 during the period which it employed Mr. Shapiro at the Portsmouth Naval Shipyard.

9.      The Portsmouth Naval Shipyard where Cianbro employed Mr. Shapiro is a federal enclave within the meaning of Article I, Section 8, Clause 17 of the United States Constitution.

10.     At all material times, Defendant was Mr. Shapiro's "employer" as that term is defined by 10 U.S.C. § 4701 and 41 U.S.C. § 4712.

11.     Defendant terminated Mr. Shapiro on May 12, 2021.

12.     On or about May 9, 2024, less than three years after he was terminated, Mr. Shapiro filed a charge of reprisal alleging violation of 10 U.S.C. § 4701 and 41 U.S.C. § 4712 with the Department of Defense Inspector General's office. A copy of the charge is attached hereto as Exhibit 1.

13.     By letter dated February 6, 2025, after more than 210 days had passed without action on Mr. Shapiro's charge, the Department of Defense issued Mr. Shapiro a right to sue letter. See 10 U.S.C. § 4701(c)(2) and 41 U.S.C. § 4712(c)(2).  A copy of the right-to-sue letter is

attached as Exhibit 2.

14.     Mr. Shapiro has exhausted his administrative remedies for purposes of the claim set forth in this Complaint.

15.     Following the issuance of the right-to-sue letter, a party who has filed a whistleblower charge with the Department of Defense Inspector General's Office has two years to institute suit.  See 10 U.S.C. § 4701(c)(2) and 41 U.S.C. § 4712(c)(2).

16.     This action is being instituted within two years from when Mr. Shapiro received the right to sue letter.

## JURY TRIAL DEMAND

17.     Mr. Shapiro hereby demands a jury trial on all issues triable of right by jury.

## STATEMENT OF FACTS

### The PNSY Project And Personnel

18.     In or about 2019, the United States Navy contracted with Cianbro to, *inter alia*, build a new dry dock at its Portsmouth Naval Shipyard ("the PNSY Project").

19.     At all times relevant to the complaint, Andy Vigue served as Cianbro's CEO.

20.     At all times relevant to the complaint, Michael Bennett served as Cianbro's Vice President, HR, Health, Safety, and Environmental.

21.     At all times relevant to the complaint, Jim Richards served as Cianbro's Senior Project Manager for the PNSY Project.

22.     At all times relevant to the complaint, Nick Martin served as the PNSY Project Superintendent together with Ryan Collet.

23.     At all times relevant to the complaint, Ryan Collet served as the PNSY Project superintendent together with Nick Martin.

24.     At all times relevant to the complaint, Spencer Lawn served as Mr. Shapiro's

immediate supervisor on the PNSY project.

25.     One part of the contract with the Navy, known as the Super Flood Project, involved dredging and building a lock system.

26.     As part of the Super Flood Project, materials, including crushed stone, known as aggregate, had to be moved by barges from the New Hampshire State Pier in Portsmouth, New Hampshire, across the Piscataqua River, to the PNSY pier in Kittery, Maine.

27.     Once the barges reached PNSY, they would be secured to a spud barge or to shore. The spud barges were secured to the seafloor by large metal columns (spuds) which lower into the sand.

28.     The project used pushboats to move the barges in question.

29.     When wired to the barge, the pushboat and barge operated as a single unit. The pushboat would be at the stern of and could push and pull the barge.

30.     Cianbro hired Mr. Shapiro in August 2020 as a deckhand.

31.     Mr. Shapiro's supervisor, Mr. Lawn, in turn reported to PNSY Project Superintendent Ryan Collet.

32.     Although hired as a deckhand, Mr. Shapiro soon commenced working as a boat operator for Cianbro, including not only operating pushboats to move the barges across the channel from Portsmouth to Kittery, but also regularly piloting the barges themselves.

33.     Mr. Shapiro held a Coast Guard license, Master 100 ton near Coastal, which allowed him to captain such vessels.

34.     Mr. Shapiro presented his license to PNSY Project Superintendent Nick Martin the week after he commenced employment.

35.     Thereafter, Mr. Shapiro operated two pushboats, the Mona and the Kenneth C.

36.     Mr. Shapiro also regularly captained the Dinny, a 40' transport vessel which was

4

also used to push barges.

37.     Mr. Shapiro regularly captained the Mona pushboat and the Dinny on his own, moving auxiliary barges throughout the PNSY, assisting in moving spud barges when they needed to be moved.

38.     On one occasion Mr. Shapiro piloted a barge loaded with 400 tons of aggregate to and from the New Hampshire State Pier when Mr. Lawn and boat operator Shawn Shannon were out, as well as co-worker Hannah Butland.

39.     On that occasion, Josh Emmons served as the acting deckhand and Dylan Blanchet ran the Mona as a secondary pushboat.

40.     On another occasion Mr. Shapiro piloted the barge when it was empty.

41.     PNSY Project Superintendent Ryan Collet was aware Mr. Shapiro was doing so on both of these occasions.

42.     In approximately March 2020, Mr. Shapiro requested that PNSY Project Superintendents Collet and Martin upgrade his pay and title to Boat Operator since Mr. Shapiro was functioning in that capacity.

43.     Messrs. Collet and Martin agreed to do so, but when nothing happened for a month, Nick Martin told Mr. Shapiro that he needed to speak with Jim Richards, the Senior Project Manager.

44.     Mr. Lawn supported Mr. Shapiro's request for a pay increase.

45.     Ultimately, Mr. Richards agreed to adjust Mr. Shapiro's pay but said he could do so only prospectively while awaiting a formal change in Mr. Shapiro's title.

46.     Mr. Shapiro was a qualified, hard-working employee.

47.     Mr. Shapiro's final salary was $1,500 per week.

<u>Mr. Shapiro's Positive March 2021 Evaluation</u>

48.    On or about March 14, 2021, Mr. Shapiro received a positive evaluation from Mr. Lawn.

49.    In that evaluation, Mr. Shapiro received a 5, the highest score possible, for safety and attitude, and a 4, the next highest score, for productivity and quality of work.

50.    Mr. Lawn commented, "Adam has been a great asset to the team. He has a good understanding of the job and all the tasks at hand."

<u>Mr. Shapiro's Safety Complaints Regarding<br>Harness Safety, Obstructed Walkways, Lack of Railings,<br>Clogged Fuel Filters Impeding Steerage, and Frayed Cables</u>

51.    For approximately two (2) months after the positive March 2021 evaluation, Mr. Shapiro repeatedly complained to his supervisors about unsafe working conditions on the tugboat.

52.    Among other things, Mr. Shapiro expressed concerns that there were inadequate protections, including lack of railings, to prevent a slip and fall accident on the barge; walkways blocked with materials, including crushed stone, making them unsafe to walk upon; a dangerous harness requirement; and frayed spud cables which raise and lower the spuds to secure barges to the seabed.

53.    To secure spud barges to the seabed, crew members lower large metal columns, called "spuds," into the water.

54.    Once lowered, spuds are embedded in the soil under water to keep the barge stationary.

55.    Spud cables lift the spuds in and out of the water.

56.    Frayed spud cables may snap, making the cable violently whip back to the winch which spins the cable.

57.    When a cable snaps, the large metal spud falls down.

58.    Spud cables snapped on several occasions.

59.    On one occasion in or about February 2021, a spud cable snapped and fell around Mr. Shapiro.

60.    Mr. Shapiro raised the cable issue with Ryan Collet, who replied that the winches which control the cables were too large for one of the barges, and Mr. Shapiro needed to be careful.

61.    As part of their duties, boat operators and deckhands walked along the edge of the largest and tallest barge to access a hydraulic motor (power pack) and its controls.

62.    When walking around the power pack, crew members had only a couple feet of walking space to the edge of the barge.

63.    On or about March 23, 2021, crew members raised concerns to Mr. Shugrue, Cianbro's Assistant Director of Health, Safety and Environmental that, without railings installed, there was a danger of slipping and falling, especially in the area around the power pack.

64.    On the largest barge, the Cape May barge, sloped piles of aggregate along the walkways created dangerous walking conditions.

65.    Walkways on the Cape May barge frequently were covered with crushed stone, blocking passage and creating a risk of slip and fall accidents.

66.    If a worker slipped, the barge had no railings to grab hold of to prevent a slip and fall accident.

67.    Crew members were exposed to risk of injury and of slipping and falling off the barge into the water.

68.    During the winter months, the aggregate at times was covered in snow and ice, creating an additional hazard.

69.    The crew working on the barge was responsible for clearing the barge before Mr.

Shapiro and his coworkers then moved it.

70.     Although the aggregate and lack of railings created a dangerous workplace, clearing aggregate from the barges was not common practice until Mr. Shapiro raised it as a safety issue.

71.     In March or April of 2021, Mr. Shapiro complained to Mr. Lawn about the walkway hazard.

72.     Mr. Lawn responded that it was not Mr. Shapiro's job to clean the other crews' barges; rather, Mr. Shapiro's job was to move the barges across the river.

73.     There was not always time to clear the aggregate, as tidal conditions limited the hours during which the barges could be moved across the Piscataqua River to and from PSNY.

74.     Mr. Shapiro was uncomfortable calling a stop work (an "all stop") to clear the barges, because it would have delayed delivering materials to the jobsite.

75.     In March 2021, Cianbro issued a directive that all employees wear harnesses when barges were moving, after Mr. Shugrue visited the jobsite and observed that some employees were not wearing a safety harness when working six (6) feet above the waterline on the Cape May barge.

76.     Although not wearing a harness in such a context had been commonplace and witnessed by management without comment, Cianbro suspended a number of employees for a week for failing to do so and directed henceforth that they needed to wear a harness when working 6' above the water, even when moving.

77.     When wearing a harness, a tether was attached from the center of an employee's back to a solid structure or cable by a large carabiner.

78.     A barge line could become tangled with the tether and pull a worker into the cleat without any means of rapid escape.

79.     When untying or tying a barge's lines, a crew member must keep clear of the coil. The line when wrapped around a cleat needs to be able to move freely under large tension loads.

80.     On March 18, 2021, after Mr. Shugrue issued his directive, Mr. Shapiro got entangled in lines which wrapped around his harness while docking the Cape May barge.

81.     On March 21, 2021, Mr. Shapiro made a written safety complaint about the harness procedure, emailing concerns to Messrs. Collet, Lawn, and Martin.

82.     The following day, March 22, 2021, Mr. Lawn directed Mr. Shapiro to either wear the harness or temporarily accept a transfer to another crew while the Cape May was being moved to the New Hampshire State Pier.

83.     Mr. Shapiro was shocked to learn that he was to be replaced by an untrained team member, which prompted him that same day to call Cianbro CEO Andy Vigue about his concerns.

84.     Mr. Shapiro did not reach Mr. Vigue but instead spoke with his assistant and told her about the safety concerns and that Mr. Shapiro felt he was being retaliated against for raising safety concerns by virtue of his removal from the Cape May crew.

85.     Mr. Vigue's office transferred Mr. Shapiro's call to Michael Bennett, Cianbro's Vice President of Human Resources, Health, Safety, and Environmental.

86.     Mr. Shapiro spoke with Mr. Bennett for about 30 minutes and detailed his safety concerns.

87.     Mr. Shapiro described the dangerous conditions created by having to wear the harness while tending lines and caused by the aggregate impeding walkways on the Cape May barge.

88.     Mr. Shapiro told Mr. Bennett that if the problems persisted, he possibly would need to call OSHA or an all stop but did not want to have to do so.

89.     As a result of Mr. Shapiro's repeated complaints, Pat Shugrue came unannounced to the jobsite on March 23, 2021, the day after Mr. Shapiro raised his concerns with Mr. Bennett.

90.     Mr. Shugrue met with Mr. Shapiro and the crew to hear the team's concerns about the

unsafe conditions and to engage the team in a discussion to try to find a solution to the safety problems raised by Mr. Shapiro.

91.     Mr. Shugrue did not appear until after Mr. Shapiro had raised concerns with five (5) Cianbro officials.

92.     During the team meeting, Mr. Shugrue emphasized the need to keep the walkways clear of hazards and obstructions.

93.     Mr. Shugrue also agreed during the meeting that wearing a harness on the Cape May and Bobby D barges while tending lines was dangerous due to the risk of becoming entangled in the lines and that tie-off requirements did not apply while docking. The other barges which were 6' or more above the water line had no way to tie off.

94.     During the team meeting, Mr. Shapiro discussed the frayed spud cables with Mr. Shugrue, and after the meeting, Mr. Shapiro wrote a CAPP (safety violation) card describing the spud cable issue.

95.     Thereafter, Mr. Shugrue and Mr. Shapiro spoke several times by phone about these concerns, and Mr. Shapiro made recommendations to Mr. Shugrue about changes that he felt should be made.

96.     Mr. Shugrue agreed with Mr. Shapiro's recommendations, including the need to install railings.

97.     In April, Mr. Shapiro submitted multiple CAPP cards, including cards about crushed stone impeding walkways on the barge and spud cables in disrepair, several of which snapped and threatened injury.

98.     On those CAPP cards, Mr. Shapiro named Ryan Collet as the superior who had been notified of the issues.

99.     Cianbro failed to respond to these CAPP cards.

100.    Later in the week that Mr. Shapiro issued the CAPP cards, Spencer Lawn warned Mr. Shapiro not to name Ryan Collet again on a CAPP card.

101.    Mr. Shapiro asked Mr. Lawn why, and Mr. Lawn insinuated that Mr. Shapiro would be fired. Mr. Lawn told Mr. Shapiro that "You gotta be careful because he'd come after you if you did that," or words to that effect.

102.    On May 4, 2021, after using the Mona to push a barge to the New Hampshire State Pier to be filled with crushed stone, Mr. Shapiro slipped on aggregate blocking the walkway of the barge and nearly fell overboard.

103.    That day, the barge was especially slippery.

104.    After Mr. Shapiro slipped, the crew swept the entire barge.

105.    Mr. Shapiro wrote a CAPP Card describing the near miss and gave the card to his foreman, Mr. Lawn, on May 5, 2021.

106.    On May 5, 2021, Mr. Shapiro showed Mr. Lawn a second CAPP card he had drafted about the need to install a fuel filter to prevent debris from getting into and clogging fuel lines, which was causing the Mona pushboat to stall and could result in it ramming the Memorial Bridge. When the pushboats stalled, the ability to steer the barges was lost, resulting in a possible loss of control, including in the tight passages around the PNSY.

107.    The second CAPP card named Messrs. Lawn and Collet as the superiors responsible for failing to act and replace the filters which were causing the loss of steerage.

108.    Upon seeing the CAPP card, Mr. Lawn became visibly angry and left to make a phone call.

109.    Accordingly, Mr. Shapiro did not submit the CAPP card after that interaction, but he retained the card.

110.    The stalling and resulting loss of control of the pushboat created a substantial and

specific danger to public health and safety including Shapiro's own health and safety, the health and safety of other employees, and the health and safety of the public.

111.    The potential dangers associated with loss of control of the pushboat are reflected in the collision between a ship and the Francis Scott Key Bridge in Baltimore, Maryland on March 26, 2024 which lead to the death of six employees performing maintenance on the bridge.[1]

112.    On May 5, 2021, Mr. Shapiro encountered Mr. Shugrue and asked about the status of new procedures to address the wearing of harnesses and aggregate impeding the walkways.

113.    Based on Mr. Shapiro's complaint and the conversations between Mr. Shugrue and the other team members, Mr. Shugrue then emailed Mr. Shapiro with new Standard Operating Procedures (SOPs) for the Cape May and Bobby D barges which did not require employees to have their harnesses tied off when handling lines at the barges' cleats.

114.    The SOP's included a tow ready checklist which expressly stated that barge walkways needed to be clean before the barges could be moved.

115.    Although dated March 26, 2021, the new SOPs had not been distributed to the PNSY supervisors as of May 5, 2021.

116.    With Mr. Shugrue's consent, Mr. Shapiro distributed the documents to the foremen on May 10, 2021, two days before he was terminated.

117.    Although Mr. Shugrue also had agreed with the need to install safety railings, Mr. Collet vetoed this recommendation, claiming that to do so would be cost prohibitive.

118.    Although Cianbro purportedly adopted Mr. Shapiro's recommendations, because there had been no real improvement, on or about May 10, Mr. Shapiro again attempted unsuccessfully to speak with CEO Andy Vigue.

---

[1] https://en.wikipedia.org/wiki/Francis_Scott_Key_Bridge_collapse

<u>May 11, 2021</u>

119.    On May 11, 2021, one week after his near miss on the aggregate barge and his complaint about the loss of control when the pushboat stalled because of the clogged fuel filters, Mr. Shapiro was again working as the boat operator on the pushboat Mona at PNSY.

120.    Shawn Shannon was working as the operator on the Kenneth C pushboat.

121.    The Kenneth C was tied to the aggregate barge; the aggregate barge was between the pier and the spud barge; and the Mona was tied to the spud barge.

122.    An excavator on the spud barge unloaded crushed stone, removing aggregate from inside the large container on the aggregate barge and dumping it into the river for the drydock.

123.    While doing so, crushed stone spilled into and impeded the walkways on the aggregate barge.

124.    The crushed stone also fell on top of lines holding the aggregate barge in place, covering the lines, which would need to be untied for the barge to depart.

125.    To shovel and sweep the stone away, Mr. Shapiro needed to pull the lines from the piles of crushed stone and coil them off of the walkways.

126.    Once the excavator had moved enough aggregate, a couple of construction workers got onto the aggregate barge to build a temporary bin wall to contain the aggregate.

127.    Mr. Shapiro went to help the construction workers raise the sides of the bin wall.

128.    While Mr. Shapiro was helping, Ryan Graves, Cianbro's Safety Specialist, expressed concern about the aggregate covering the barge.

129.    Mr. Graves expressed concern that the Coast Guard would object to the uncleared aggregate, creating a compliance issue.

130.    Mr. Shapiro asked Mr. Graves whether he would call an all stop, and Mr. Graves left the decision up to Mr. Shapiro.

131.    Mr. Shapiro then called an all stop to address the hazardous conditions raised by Mr. Graves before the barge was towed back to the New Hampshire State Pier.

132.    After Mr. Shapiro called the all stop, he and Shawn Shannon spent about an hour sweeping the crushed stone off walkways of the aggregate barge and removing coiled lines.

133.    To make the barge safe, Mr. Shapiro and Mr. Shannon divided their work by each addressing one side of the aggregate barge.

134.    Mr. Shannon began cleaning the port side of the aggregate barge's walkways.

135.    At the same time, Mr. Shapiro cleaned the starboard side of the aggregate barge, which contained a larger quantity of aggregate.

136.    On the starboard side, which Mr. Shapiro was cleaning, aggregate had fallen on top of the lines holding the barge in place.

137.    Mr. Shapiro picked up the lines and coiled them, which needed to be done before he could begin to shovel and sweep the spilled aggregate off the barge.

138.    Another employee was coming onto the aggregate barge to serve as an acting deckhand to move the barge while Mr. Shapiro operated the Mona and Shawn Shannon was operating the Kenneth C.

139.    Mr. Shapiro wanted the acting deckhand to have safe walkways to untie the lines and move them from the starboard side over to the port side of the aggregate barge while underway.

140.    While Messrs. Shapiro and Shannon were working, Mr. Collet arrived and had a brief exchange with Mr. Shapiro.

141.    Mr. Collet asked Mr. Shapiro to stop his current work to assist Mr. Shannon on the opposite side of the barge.

142.    The aggregate barge was tied up on the starboard side that Mr. Shapiro was

14

clearing, and the lines needed to be moved to port side to complete the subsequent tasks of safely

detaching and moving the barge to the State Pier, where it would be tied on the port side.

143. To do so, a worker had to be able to safely work on the starboard side that Mr.

Shapiro was cleaning.

144. Mr. Shapiro explained his concern to Mr. Collet that to safely move the aggregate

barge, both sides needed to be cleared, and to begin clearing that side, he first needed to pull the

lines from the crushed stone and then coil them away from the walkway.

145. Mr. Collet replied that the side Mr. Shapiro was clearing did not require clearing to

move the barge and directed Mr. Shapiro to help Mr. Shannon clean the aggregate from the port

side of the barge.

146. Mr. Shapiro ultimately stopped what he was doing and assisted Mr. Shannon with

shoveling stone on the port side of the boat, as directed by Mr. Collet.

147. The conversation between Mr. Collet and Mr. Shapiro lasted no more than one

minute.

148. After clearing Mr. Shannon's side of the barge, Messrs. Shannon and Shapiro then

cleaned the other side out of concern for safety.

149. After the barge was cleaned, Mr. Shapiro, Mr. Shannon, and another deckhand then

moved the emptied barge to the New Hampshire State Pier.

150. Mr. Shannon drove the barge using the Kenneth C, while Mr. Shapiro operated the

Mona as a secondary pushboat.

<u>Termination in Reprisal for Whistleblower Activity</u>

151. On May 12, 2021, the day after Mr. Shapiro called the "all stop" because of unsafe

working conditions on the barge, Mr. Collet terminated Mr. Shapiro's employment ostensibly for

"not taking direction."

152. When Mr. Shapiro asked Mr. Collet for further explanation of what direction he had failed to follow, Mr. Collet responded that it was "not necessary to get into the weeds" and declined to give Mr. Shapiro any explanation.

153. Mr. Shapiro responded, "If there ever was a day to get into the weeds, today is the day."

154. Mr. Collet showed Mr. Shapiro his termination letter, which states Mr. Shapiro was fired for "not taking direction."

155. Cianbro terminated Mr. Shapiro without first employing progressive discipline.

156. The same day Mr. Shapiro was terminated, Andy Vigue returned Mr. Shapiro's call.

157. Mr. Shapiro told Mr. Vigue he had been terminated.

158. Mr. Vigue professed not knowing about it and said he would investigate it, but Mr. Shapiro never heard back from him.

159. Mr. Shapiro was terminated by Cianbro in reprisal for his repeated complaints about unsafe working conditions including reports on the day before his termination, because the day before Mr. Shapiro was terminated, he delayed operating an unsafe tug and barge until it could be secured against slip and fall dangers, and because of his reports a week earlier that it was unsafe to operate the pushboats because of the loss of control when they stalled.

160. Mr. Shapiro delayed moving the barge on May 11, 2021, out of a good faith safety concern that aggregate was impeding the walkways of the aggregate barge, having just had a near miss one week earlier and only after first speaking with Safety Coordinator Graves about a Coast Guard compliance issue.

## COUNT I

### For Violation of 10 U.S.C. § 4701

161. Plaintiff repeats and realleges all of the foregoing paragraphs as if repeated in full

16

herein.

162.    Mr. Shapiro reasonably believed that Cianbro's failure to maintain barge walkways clear of aggregate, its harness procedure, frayed spud cables, and the blockage of the fuel filters were practices or conditions that created a substantial and specific danger to public health and safety including his own health and safety and the health and safety of other employees.

163.    Mr. Shapiro's reports to Cianbro management of the working conditions set forth herein were protected by 10 U.S.C. § 4701(c)(2).

164.    Mr. Shapiro was motivated to make the reports in question to shed light on the unsafe conditions and in hopes that his reports would lead to the elimination of the unsafe conditions.

165.    Mr. Shapiro was threatened by Cianbro supervisors for his reported concerns protected by 10 U.S.C. § 4701(c)(2).

166.    The conduct displayed by Mr. Lawn towards Mr. Shapiro is evidence of retaliatory animus.

167.    The immediacy with which Cianbro fired Mr. Shapiro after he engaged in protected activity is evidence of retaliatory animus.

168.    Mr. Shapiro's protected activity under 10 U.S.C. § 4701(c)(2) was a substantial factor in the decision to terminate his employment.

169.    The fact that Cianbro has dissembled the facts surrounding Mr. Shapiro's termination and the reasons for his termination is strong evidence that the real reason for his termination was unlawful retaliation and reprisal against Mr. Shapiro for his protected activity.

170.    Cianbro terminated Mr. Shapiro in violation of 10 U.S.C. § 4701(c)(2) because he, acting in good faith, reported orally and in writing to Cianbro what he had reasonable cause to believe were conditions or practices that created a substantial and specific danger to public health

and safety including Mr. Shapiro's own health and safety and the health and safety of other employees.

## COUNT II

### For Violation of 41 U.S.C. § 4712

171.    Plaintiff repeats and realleges all of the foregoing paragraphs as if repeated in full herein.

172.    Cianbro terminated Mr. Shapiro in violation of 10 U.S.C. § 4712(c)(2) because he, acting in good faith, reported orally and in writing to Cianbro what he had reasonable cause to believe were conditions or practices that created a substantial and specific danger to public health and safety including Mr. Shapiro's own health and safety and the health and safety of other employees.

## COUNT III

### Post-Termination Reprisal In Violation of 10 U.S.C. § 4701

173.    Plaintiff repeats and realleges all the foregoing paragraphs as if repeated in full herein.

174.    Following his termination, Mr. Shapiro requested Cianbro prepare Department of Homeland Security U.S. Coast Guard Small Vessel Sear Service Form attesting to the time he served on the barge. A copy of the form is attached hereto as Exhibit 3.

175.    Mr. Shapiro desired that Cianbro prepare the form so that he could upgrade his license.

176.    Although Mr. Shapiro claims he worked as an operator and not a deckhand while employed by Cianbro, for purposes of the form he was willing to have Cianbro state that he worked as a deckhand.

177.    Cianbro refused to provide Mr. Shapiro with the Coast Guard form.

178.    Cianbro's refusal to provide Mr. Shapiro with a letter showing the length of service that he piloted boats was in reprisal for Mr. Shapiro's opposition to what he reasonably believed to be Cianbro's violations of 10 U.S. C. § 4701.

179.    Cianbro's failure to provide the letter had adverse impacts on Mr. Shapiro's efforts to mitigate the damages from his unlawful termination and move forward with his career.

## COUNT IV

## Post-Termination Reprisal In Violation of 41 U.S.C. § 4712

180.    Plaintiff repeats and realleges all the foregoing paragraphs as if repeated in full herein.

181.    Cianbro's refusal to provide Mr. Shapiro with a letter showing the length of service that he piloted boats was in reprisal for Shapiro's opposition to what he reasonably believed to be Cianbro's violations of 41 U.S. C. § 4712.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court grant the following relief:

A.    Enter Judgment in Plaintiff's favor;

B.    Declare Defendant's conduct to be in violation of Plaintiff's rights under 10 U.S.C. § 4701.

C.    Declare Defendant's conduct to be in violation of Plaintiff's rights under 41 U.S.C. § 4712.

D.    Enjoin Defendant, its agents, successors, employees, and those acting in concert with them from continuing to violate Plaintiff's rights;

E.    Order Defendant to reinstate Plaintiff or alternatively award Mr. Shapiro front pay and benefits;

F.    Award Mr. Shapiro lost future earnings to compensate Plaintiff for the diminution

in expected earnings caused by Defendant's discrimination;

G.    Award Mr. Shapiro back pay and benefits;

H.    Award Mr. Shapiro compensatory damages in an amount to be determined at trial;

I.    Award Mr. Shapiro punitive damages in an amount to be determined at trial;

J.    Award Mr. Shapiro nominal damages;

K.    Award Mr. Shapiro attorney's fees, including legal expenses and costs;

L.    Award Mr. Shapiro prejudgment and post-judgment interest;

M.    Permanently enjoin Defendant from engaging in any employment practice which retaliates against employees who engage in protected activity under 10 U.S.C. § 4701 and under 41 U.S.C. § 4712.

N.    Require that Defendant train all management level employees about the illegality of reprisal;

O.    Require that Defendant place a document in Plaintiff's personnel file which explains that they unlawfully terminated Plaintiff because of reprisal; and

P.    Grant to Plaintiff such other and further relief as may be just and proper.

Dated this 22nd day of April 2025

/s/ Jeffrey Neil Young
Jeffrey Neil Young Esq. Maine Bar No. 3874
SOLIDARITY LAW, PLLC
9 Longmeadow Rd.
Cumberland Foreside, ME 04110
Jyoung@solidarity.law
Tel 207-844-4243

/s/ Chad T. Hansen
Chad Hansen, Esq., Maine Bar No. 9489
EMPLOYEE RIGHTS GROUP
92 Exchange Street, 2nd floor
Portland, Maine 04101
Chad@employeerightslaw.attorney
Tel (207) 874-0905
Fax (207) 874-0343

Counsel to Plaintiff Adam Shapiro